## No. 6740.

### SATTLER & CO. VS. LEONARD MARINO.

Where an insolvent merchant, pressed by creditors, nominally sells to his penni-
    less clerk a stock of goods which the clerk and he know are not paid for and
    accepts in payment of the goods a debt for pretended wages he owes the clerk,
    and the promissory notes of the clerk, the transaction will be considered a
    fraudulent simulation.

APPEAL from the Fourth District Court, parish of Orleans. *Houston,*
J.

*F. L. Richardson* for plaintiffs and appellees.

*L. A. Sheldon* for Salvador Marino, intervenor and appellant.

*Thos. Gilmore & Sons* for Hernsheim & Co., intervenors and appel-
lees.

The opinion of the court was delivered by

DEBLANC, J. Leonard Marino had a store in this city, and—judg-
ing from the number of his creditors and the amount of their bills, his·
credit far exceeded his means. He became seriously·involved, asked
the attorney representing one of his creditors a delay of two months to
satisfy his claim, and five days after — before the creditor's answer—
sold his stock of goods to his brother Salvador, who—since his arrival
from Europe, had lodged and boarded with him.

The sale from Leonard to Salvador Marino is attacked, by the cred-
itors of the former, as being a mere simulation intended to cover up his
property; or at least that which he alleges he transferred to his brother,
and which—at sheriff's sale, brought $1100.

At the date of the sale, what was the state of the affairs of Leonard
Marino ? He confessed on the trial that—at said date—he could not
have paid what he owed.

Sattler & Co. vs. Marino.

He was asked:

"What was the amount of your debts when you sold your property?"

A.   "I have not made a regular calculation."

Q.   "Did you owe over $20,000?"

A.   "I made no regular calculation."

Q.   "Did you owe over $20,000?"

A.   "I made no calculation; it might have been less, it might be more."

Q.   "Don't you know whether you owed over $10,000?"

A.   "I believe I do."

Q.   "You know you owed a great deal more than that."

A.   "If I had the accounts I could add them up."

Q.   "Do you mean to say you did not add up your accounts before the sale?"

A.   "I never kept regular books."

Question repeated.

A.   "No, I did not."

Q.   "How long before the sale did you add up your accounts?"

A.   "I did not keep regular books.   I used to keep the invoices."

Q.   "Did you ever know how much you owed?"

A.   "Not exactly."

Salvador Marino testified as follows:

Q.   "Did you make the purchase of the stock of goods which has been seized and sold?"

A.   "Yes, sir."

Q.   "Of whom, and when?"

A.   "From my brother on the twentieth of January."

Q.   "When did you take possession?"

A.   "The same day."

Q.   "Who had possession from the twentieth up to the time of seizure?"

A.   "I had."

Q.   "Had Leonard Marino anything to do after time of sale up to the time of seizure?"

A.   "No, sir, nothing at all."

Q.   "State what were the terms of sale."

A.   "I bought it for eighteen months' wages due me, and three notes."

Q.   "How much were the wages?"

A.   "Seventy-five dollars a month."

Q.   "How much did the notes amount to?"

A.   "Four thousand five hundred and fifty-seven dollars."

Q. "After you took possession, and before the seizure, did you buy any goods of any body else?"

A. "Yes, I did."

Q. "Have you got the bills of those purchases?"

A. "I have."

Q. "Do these bills show these purchases, and where you made them?"

A. "Yes, they do."

Q. "Who paid for the goods—those last bills?"

A. "I did."

Q. "Were these goods in the store, when the sheriff made the seizure?"

A. "Not all of them."

Q. "A portion of them were?"

A. "A majority," etc.

The deputy sheriff who made the seizure, was asked: "Whom did you find in possession of the store, when you seized it?" He answered: "Salvador Marino, a good many clerks and negroes: Salvador Marino claimed possession of the store, and said, in an excited manner that it did not belong to his brother, but to him: to which the deputy replied it made no difference, and seized.

At the date of his intervention in this suit, Salvador Marino had been in this country for about four years, and—from the first day of his arrival here until the twentieth of January 1877—he was, he said, in his brother's store and had never been out of it. There he lodged and boarded. On the twentieth of January, for his wages as a clerk, his brother was owing him—this is his own declaration, thirteen hundred and fifty dollars, and—on that day—he, the favorite clerk and pretended creditor, became the owner of the store.

The proposition to 'sell came from Leonard, and the consideration of a transfer proposed by and accepted by one who—then—was notoriously insolvent, and about to be sued, was the wages alleged to be due by the vendor to the vendee, and four notes from the latter to the former, payable at twelve, eighteen, twenty-four and thirty months —in all $5807. Not a cent of the price was paid in cash, though on that day—according to Salvador's sworn declaration, he had and could have paid—on account—the sum of two hundred dollars. It is true that, on the very same day, he told Leonard "I have no money," and Leonard replied "You can give me notes."

This Salvador did, and took possession—without being asked by, or informing any one whither he was going, Leonard said: "Good evening; I hope all of you shall have better luck than I have had." He then left penniless the store in which, during four years, he had entertained

a penniless brother, and that brother did not even invite him to spend the approaching night in the home where—for so long—they had lived, boarded and slept together. Did they so part because Leonard was angry with Salvador for having accepted his proposition, or because that unnatural parting had been pre-arranged and agreed upon between the two brothers? The creditors, bills in hand, had already knocked at the door, a cloud big with petitions, citations and notices of seizure was about to burst on the store, and—to avert its effects, the semblance of a sale was interposed between the creditors and the merchandize, the price of which—to the knowledge of vendor and vendee—was and is yet unpaid.

Leonard, after the sale from him to Salvador, sold some wagons for five hundred dollars, and, at about that time, drew out what he had in bank and even overdrew his account, and, with that money, paid unnamed merchants, and did not pay any one of the merchants who had supplied his store in September, October, November and December 1876, nor the balances due to his many clerks and employees. Do not these facts justify at least a presumption that he divided with his brother—took all the funds which had been realized from the sale of the unpaid merchandize, and apparently transferred to his brother, to be held for his and their common benefit—whatever there remained in the store.

The marked ability with which Salvador's pretensions have been sustained, has partly disguised the enormity of those pretensions, the baldness of as palpable a fraud as ever was attempted. "It looks funny," as said to Leonard by one of his creditors, "that you sold your store for notes." He replied that he considered as the most honorable of his debts that which he had thus paid.

We learn from the evidence, that Leonard was indebted to one G. Grande—his friend and countryman—for three thousand five hundred dollars, which he swore he borrowed from him. To that friend, in part payment of that indebtedness, he transferred three of the notes subscribed in his favor by Salvador, and that too indifferent transferee stood by, allowed the store to be sold by the sheriff, and did not claim the vendor's lien securing the notes which he took from Leonard.

Had it been proven that—for wages due from Leonard to Salvador—a lot of merchandize equal in value to the amount of the wages, had been transferred from the notoriously insolvent merchant to a favored clerk, the sale—though fraudulent—would have been merely voidable; but—here—the whole of a store valued at $5807, was sold by an insolvent and pressed debtor, in part for wages claimed, and which—if due—would amount to only $1350. To presume that they are due, we would have to presume that one who—outside of his wages—was absolutely without means, has—for the space of eighteen months provided for him-

Sattler & Co. vs. Marino.

self the necessaries of life, without drawing a cent from his salary, without incurring any liability toward the employer, at whose table he took his meals, in whose bed he slept. This is incredible.

The fact that—after the sale of the twentieth of January—Salvador hastened to buy in his own name, for what he calls his store, was only an additional precaution resorted to by him to manufacture and obtain evidence, to conceal a manifest simulation.

Be this as it may, no insolvent merchant can sell to his insolvent clerk, for the latter's wages, and at twelve, eighteen, twenty-four and thirty months' credit, a stock of goods valued by themselves at more than four times the amount of the wages, and the price of which both the merchant and the clerk know to be yet due to those who furnished the goods. Such a sale is, beyond a doubt, a fraudulent simulation. Were it simulated but in part, how could we distinguish its real and unreal parts, and decide which of the contents of a store sold as an entirety, should pass to one who did not intend to buy, and which should be considered as still belonging to one who did not intend to sell. The fraud, in this instance, does not merely consist in the endeavor to give or obtain a preference over other creditors, but to place out of those creditors' reach the property which is their common pledge, and that fraud tainted and nullified, at its very inception, the whole of a contract, no branch of which ever had a legal existence.

The judgment appealed from is affirmed with costs.